# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EFSTATHIA BURA,
  Plaintiff

v.

GEORGE WASHINGTON UNIVERSITY
  Defendant

Civil Action No. 15-533 (CKK)
REDACTED

## MEMORANDUM OPINION[1]
(July 9, 2019)

This is a sex discrimination case brought by a statistics department professor at George

Washington University.[2]  Plaintiff Efstathia Bura, a female full professor, alleges that she was

paid less than other male professors on account of her sex.  Plaintiff brings this lawsuit against

Defendant George Washington University under the Equal Pay Act ("EPA"), Title VII of the

Civil Rights Act ("Title VII"), and the District of Columbia Human Rights Act ("DCHRA").

Before the Court is Defendant's [101] Motion for Summary Judgment. As to Plaintiff's

EPA claim, Defendant contends that Plaintiff cannot establish a prima facie case as she has not

properly alleged male comparators. And, even if Plaintiff has alleged male comparators,

Defendant argues that any pay disparities are attributable to one or more of Defendant's five

affirmative defenses. As to Plaintiff's Title VII and DCHRA claims, Defendant contends that

---

[1] This Memorandum Opinion is redacted as it discusses, references, and quotes multiple exhibits which were filed under seal by the parties. The Court also filed an unredacted version of this Memorandum Opinion under seal. However, the Court notes that if this case proceeds to trial, the redacted information is likely to be made public.

[2] There is some dispute as to Plaintiff's current employment status. *See* Def.'s Reply, ECF No 108-1, 2 n.1. Plaintiff has not taught at George Washington University since 2016. However, it appears that she remains on leave from the University while teaching at a different university in Vienna, Austria. *Id.* Regardless, Plaintiff's current employment status is not germane to the issues before the Court.

Plaintiff has failed to rebut its proffered nondiscriminatory reasons for pay disparities between Plaintiff and higher paid male professors.

Upon consideration of the pleadings,[3] the relevant legal authorities, and the record as a whole, the Court DENIES Defendant's motion. First, as to Plaintiff's EPA claim, the Court finds that a reasonable jury could conclude that Plaintiff has identified male comparators and that any pay disparities between Plaintiff and those male comparators are not fully attributable to Defendant's affirmative defenses. Second, as to Plaintiff's Title VII and DCHRA claims, there is a material dispute of fact as to whether or not Defendant's proffered nondiscriminatory reasons are the legitimate cause of its pay decisions affecting Plaintiff.

## I. BACKGROUND

Plaintiff Efstathia Bura has been a member of George Washington University's statistics department since she was hired in 1996 as an assistant professor in a tenure-track position. Def.'s Statement of Material Facts for which there is No Genuine Issue ("Def.'s Stat."), ECF No. 101-2, ¶ 1. In 2002, Plaintiff became an associate professor. *Id.* In the Fall of 2011, Plaintiff applied for promotion to full professor. *Id.* at ¶ 23.

---

[3] The Court's consideration has focused on the following documents and their attachments and/or exhibits: Def. the George Washington University's Mot. for Summary Judgment, ECF No. 101-2 ("Def.'s Mot."); Pl.'s Mem. in Opp'n to Def.'s Mot. for Summary Judgment, ECF No. 105-2 ("Pl.'s Opp'n"); Def. the George Washington University's Reply in Support of its Mot. for Summary Judgment, ECF No. 108-1 ("Def.'s Reply"); Pl.'s Notice of Supp. Authority, ECF No. 113 (Pl.'s Notice); and Def. the George Washington University's Res. to Pl.'s Notice of Supp. Authority, ECF No. 114 ("Def.'s Res. to Notice"). In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

██ Regardless, the majority of full professors in the statistics department voted against Plaintiff's promotion. Def.'s Stat., ECF No. 101-2, ¶ 25. The Tenure and Promotion Committee also decided against the promotion. *Id.* at ¶ 26. Plaintiff appealed, ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

██ Plaintiff received the standard pay increase for promotion to full professor of ████. *Id.* at ¶ 29. ████████████████████████████████████ *Id.* at ¶ 30. On May 9, 2013, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination relating to, among other things, her compensation. *Id.* at ¶ 31.

In support of her discrimination claim, Plaintiff cites comments by members of the statistic department faculty which she claims show a bias against women. For example, in 2000, Dr. Hosam Mahmoud commented in front of Plaintiff that "[f]or every one thousand worthy men [in the sciences] there is perhaps one worthy woman." *Id.* at ¶ 43. And, other professors commented about Plaintiff's appearance, her relationships with men, and her shopping habits. *Id.* at ¶¶ 43-46.

Following Plaintiff's charge of discrimination, Dean Barratt asked Plaintiff to participate in a university-wide salary review in which Plaintiff's salary ████████████████. *Id.* at ¶ 32. Dean Barratt then directed that Plaintiff receive an ████████████ analysis. Defendant conducted an ████████████ analysis ████████████████████████████████ ████████████████████ ████████████████████████████████ ████████████████████. *Id.* at ¶ 33.[4] Annual pay increases are recommended by the

---

[4] ████████████████████████████████████████████████████████ ████████████████████████████ ████████████████████████

department chair, and approved by the dean, based on the department chair's Annual Reports assessing each professor based on research, teaching, and service to the university. *Id.* at ¶ 109-10. As a result of the ███████████ analysis, ███████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████ █

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████

    In addition to her EEOC charge, following the failure of the statistics department

professors to promote Plaintiff to full professor, ███████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

    On April 10, 2015, Plaintiff filed this lawsuit alleging disparate pay based on sex.

Plaintiff brings claims under the EPA, Title VII, and the DCHRA. The parties have completed

discovery. Defendant now moves for summary judgment on each of Plaintiff's claims.

Defendant's Motion for Summary Judgment is currently before the Court.[5]

---

[5] Defendant contends that Plaintiff's Statement of Genuine Issues in response to Defendant's Statement of Material Facts for which There is No Genuine Issue failed to comply with Local

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir.

---

Rule 7(h) for multiple reasons. Defendant asks that the Court treat as undisputed any statement that is not disputed in accord with Rule 7(h). While Plaintiff's Statement of Genuine Issues is not an archetype of good pleading, the Court concludes that it should exercise its discretion to consider Plaintiff's Statement. *See Gardels v. Cent. Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980) (explaining that courts have discretion to consider pleadings that do not comply with the local rules). The Court will consider Plaintiff's Statement because the Court is able "to decide [this] motion[ ] for summary judgment efficiently and effectively" using Plaintiff's Statement and has not been "obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories" in order to do so. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150-51 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory intent, the district court should approach summary judgment in an action for employment discrimination with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*). Be that as it may, the plaintiff is not relieved of her burden to support her allegations with competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage she bears the

burden of production to designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III. DISCUSSION

Plaintiff brings claims for disparate pay under the EPA, Title VII, and the DCHRA. Defendant argues that Plaintiff's EPA claim should be dismissed because she has failed to allege male comparators who receive higher pay and because any potential pay disparities are attributable to one or more of Defendant's five affirmative defenses. Defendant further argues that Plaintiff's Title VII and DCHRA claims should be dismissed because Plaintiff has failed to produce evidence rebutting Defendant's proffered nondiscriminatory reasons for any pay disparities between Plaintiff and higher paid male professors. The Court disagrees. As will be explained further below, the Court concludes that Plaintiff has produced sufficient evidence to create a material dispute of fact as to Defendant's proffered reasons for the disparate pay and to foreclose judgment as a matter of law in favor of Defendant on Plaintiff's EPA, Title VII, and DCHRA claims at this stage in the litigation.

However, before the Court considers Defendant's arguments in support of granting summary judgment on Plaintiff's EPA, Title VII, and DCHRA claims, the Court will consider a premise which underlies many of Defendant's arguments. Defendant contends that its pay decisions involve the exercise of specialized judgment about relative performance by faculty and are entitled to deference. The Court disagrees.

7

## A. Deference on Academic Decisions

Defendant argues the Court should defer to Defendant's judgments concerning the relative performances of its faculty as those judgments require specialized expertise. The Court concludes that no special deference is owed. In reaching its decision, the Court is guided by the recent opinion from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), *Mawakana v. Board of Trustees of the University of the District of Columbia*, No. 18-7059, 2019 WL 2479587 (D.C. Cir. June 14, 2019). In *Mawakana*, the court considered whether or not to grant a university academic deference on its tenure decisions when faced with Title VII and DCHRA discrimination claims.

The *Mawakana* court began by explaining that when Title VII was first passed, educational institutions were exempt "'with respect to the employment of individuals to perform work connected with the educational activities of such institution[s].'" 2019 WL 2479587 at *2 (quoting Pub. L. No. 88-352, § 702, 78 Stat. 253, 255). However, soon thereafter, in response to discrimination in universities, Congress removed that exemption. *Id.* "Ever since the Congress 'abandoned [Title VII's] exemption for educational institutions' in 1972, their academic hiring has been subject to Title VII's restrictions." *Id.* (quoting *Univ. of Pa. v. EEOC (Penn)*, 493 U.S. 182, 190 (1990)).

Thirteen years after the removal of the Title VII exemption for universities, the United States Supreme Court granted universities deference when making certain decisions. *Id.* In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985), a student sued a university arguing that the university had violated his due process rights by arbitrarily dismissing him from school. 474 U.S. at 217. The Supreme Court granted the university deference and found the dismissal not arbitrary. *Id.* at 223. The Supreme Court explained that "[w]hen judges are asked to

8

review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." *Id.* at 225.

Five years after *Ewing*, the Supreme Court suggested that, despite *Ewing*, "the normal Title VII standard applies to universities." *Mawakana*, 2019 WL 2479587 at *2. In *Penn*, the Supreme Court determined that a university had to comply with a subpoena of materials related to the tenure determination process of a professor who had sued under Title VII. 474 U.S. at 201-02. The Supreme Court explained that tenure decisions are subject to the same enforcement procedures as other employment determinations and that compliance with Title VII would not infringe on the university's academic freedom. *Id.* at 190, 198. In distinguishing *Penn* from *Ewing*, the Supreme Court explained that *Penn* should not "be understood as a retreat from th[e] principle of respect for legitimate academic decisionmaking" set forth in *Ewing. Id.* at 199.

Relying on *Penn*, the *Mawakana* court concluded that "*Ewing* and the concept of academic freedom do not entitle a university to special deference in Title VII tenure cases." *Mawakana*, 2019 WL 2479587 at *3. The court explained that one of the reasons for deference in *Ewing* was that the Supreme Court assumed that the university had acted in good faith; but, such an assumption cannot be made "in a Title VII case, where the question is *whether* the employer acted in good faith." *Id.* Additionally, in *Ewing* the Supreme Court deferred to the university because it was reviewing the substance of an academic decision. "That premise also cannot be assumed in a Title VII case, where a court is asked to evaluate the reason for—as opposed to the substance of—the University's decision and thus *whether* the employer's decision was 'genuinely academic.'" *Id.* Based on this reasoning, the *Mawakana* court determined that the defendant university was not entitled to deference on its tenure decision when facing a discrimination claim. *Id.*

The Court recognizes that, in *Mawakana*, the D.C. Circuit was addressing academic deference in the context of tenure decisions, whereas, here, Defendant requests academic deference in the context of pay decisions. However, Defendant has presented no argument as to why the Court's analysis would differ between tenure and pay decisions. In fact, in its Motion, Defendant states that "[o]pinions in tenure cases are helpful in analyzing faculty pay disputes such as this case." Def.'s Mot., ECF No. 101-2, 7. Additionally, the Court concludes that the D.C. Circuit's decision is not strictly cabined to tenure decisions. *Mawakana*, 2019 WL 2479587 at \*3 (explaining that "the Title VII burden is no more difficult to meet *because* the employer is a university"). As with Title VII claims on tenure decisions, in Title VII claims on pay decisions, the Court is tasked with determining *whether* the university's pay decision was made in good faith and was genuinely academic. As such, the Court finds that academic deference on Defendant's pay decisions is not warranted; instead, Plaintiff's "burden is no more difficult to meet than in any other Title VII case where the employment decision at issue involves complex judgments and numerous decisionmakers are involved." *Id.*

**B. Plaintiff's EPA Claim**

Having determined that Defendant's pay decisions are not entitled to special deference, the Court now turns to Defendant's arguments in support of summary judgment on Plaintiff's EPA claim. First, Defendant argues that many of its pay decisions are excludable under the statute of limitations. Second, Defendant contends that Plaintiff has failed to properly identify comparators, or higher-paid male professors who performed substantially equal work under substantially equal conditions. Third, Defendant claims that any disparate pay decisions can be adequately explained by one or more of its five affirmative defenses. The Court will address each

argument in turn, and, ultimately, DENIES Defendant's Motion for Summary Judgment on Plaintiff's EPA claim.

**1. Limitations Period for Pay Decisions**

As an initial matter, the Court must determine which of Plaintiff's EPA claims are timely. The statute of limitations under the EPA is two years, or three years if the violation was willful. *See* 29 U.S.C. § 255(a). Plaintiff filed her Complaint on April 10, 2015. And, according to Defendant, Plaintiff has not alleged willful conduct. As such, Defendant contends that any pay decisions prior to April 10, 2013 are time barred under the EPA. The Court disagrees.

In determining the limitations period for Plaintiff's EPA claim, the Court notes that the parties entered into a Tolling Agreement. According to the parties' Tolling Agreement, executed on June 20, 2014, the limitations period for Plaintiff's claims was tolled from the execution of the agreement through the "Termination Date." Ex. 40, ECF No. 105-45. Neither party cites any evidence showing that the Tolling Agreement was ever terminated. As such, the Court concludes that the relevant date for determining the limitations period is June 20, 2014, the date that the tolling agreement was executed, rather than April 10, 2015, the date Plaintiff filed her lawsuit.

The next disputed issue concerns whether the EPA's limitations period should be two years or three years for willful conduct. Plaintiff argues that she has alleged that Defendant's violations of the EPA were willful, as such the limitations period should be extended from two years to three years. Defendant disagrees. However, neither party defines willfulness under the EPA or provides substantive argument on the issue. At the summary judgment stage, the Court need not determine whether or not Defendant's alleged violations were willful.

Instead, the Court concludes that while Plaintiff may not recover for discriminatory pay outside the limitations period, evidence of discriminatory conduct occurring outside the

limitations period may be introduced. "[I]t is no defense [under the EPA] that the unequal payments began prior to the statutory period." 29 C.F.R. § 1620.13(b)(5). In other words, the fact that a discriminatory pay decision was made outside the limitations period does not prevent a plaintiff from bringing a timely EPA claim. Instead, "each paycheck resulting from the original 'discriminatory compensation decision or other practice' triggers a new filing period, in effect reviving a claim that otherwise would have been time-barred." *Johnson v. D.C.*, 632 F. Supp. 2d 20, 22 (D.D.C. 2009) (discussing disparate pay claims under Title VII); *see also Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) ("Evidence of wage discrimination need not be confined to the EPA's ... limitation period, however for a court may consider relevant evidence from before that period while assessing the worker's claims."). As such, Plaintiff may introduce evidence of disparate pay decisions made outside the limitations period in order to support her EPA claim even if Plaintiff can recover damages only from actions taken within the limitations period.

The cases cited by Defendant to the contrary are not persuasive. The case which Defendant primarily relies upon for the argument that discriminatory acts outside the limitations period cannot be considered is *Schrader v. Tomlinson*, 311 F. Supp. 2d 21 (D.D.C. 2004). However, in *Schrader*, the Court refused to consider decisions made outside the limitations period because the plaintiff's claim concerned a failure to promote rather than disparate pay. 311 F. Supp. 2d at 28 ("[P]laintiff's EPA claim can be construed as a complaint about not being promoted to a GS-13 position and not receiving GS-13 pay, in light of the fact that she was allegedly doing the same work as a GS-13 employee."). Here, Plaintiff is clearly stating a disparate pay claim, not a failure to promote claim. *See* Pl.'s Res., ECF No. 105-3, ¶ 25 ("Bura's promotion to full professor is not part of her claims."). As such, *Schrader* does not assist the

Court in its analysis. The remaining cases cited by Defendant are similarly unpersuasive. *See,*
*e.g., Tovihlon v. Allied Aviation, Inc.*, 323 F. Supp. 3d 6, 16 n.3 (D.D.C. 2018) (concluding that
the court "does not need to resolve th[e] issue" of whether or not incidents outside the limitations
period could prove a Title VII claim); *Reiff v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No.
13-CV-192-JDP, 2014 WL 4546041, at *7 (W.D. Wis. Sept. 12, 2014) (explaining that the
paycheck accrual rule applies only to "discriminatory compensation decisions applied to
similarly situated employees doing the same work"); *Ghiselli v. Greyhound Lines, Inc.*, No. H-
12-990, 2014 WL 1022887, at *9 (S.D. Tex. Mar. 17, 2014) (not addressing the issue); *Smith-*
*Haynie v. D.C.*, 155 F.3d 575, 577 n.1 (D.C. Cir. 1998) (dismissing the plaintiff's EPA claim as
time-barred because the plaintiff "failed to contest" the issue of whether or not the most recent
offense occurred within the limitations period*); but see Henze v. City of Lee's Summit*, No. 09-
00099-CV-W-DGK, 2010 WL 11566047, at *2 (W.D. Mo. Aug. 3, 2010) (prohibiting the
introduction of evidence of potential EPA claims outside the statute of limitations, but providing
no reasoning and no description of the excluded evidence).

Accordingly, the Court concludes that Plaintiff may use evidence from outside the
limitations period to establish her EPA claim. However, the Court notes that Plaintiff may
recover damages only for claims within the limitations period. At this point in the litigation, and
given the extremely limited briefing on willfulness, the Court need not decide if the limitations
period for which Plaintiff may recover damages dates back to June 20, 2011 or June 20, 2012.
What is relevant for the Court's purposes at this time is that the Court may consider evidence
from outside the limitations period in deciding whether or not to grant summary judgment on
Plaintiff's EPA claim.

## 2. Plaintiff's Identifying of Comparators

Now that the Court has determined what evidence can be considered in analyzing Plaintiff's EPA claim, the Court looks to whether or not Defendant is entitled to summary judgment on Plaintiff's EPA claim. The EPA generally prohibits discrimination "between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). According to the regulations, the work must be "substantially equal" but need not be "identical." 29 C.F.R. § 1620.13(a).

In making a claim pursuant to the EPA, the plaintiff has the initial burden of proving both wage disparity and job equality. *See Johnson v. D.C.*, 947 F. Supp. 2d 123, 130 (D.D.C. 2013), *aff'd*, 612 Fed. App'x 619 (D.C. Cir. 2015). To meet this initial burden and establish a prima facie violation of the EPA, the plaintiff must show by a preponderance of the evidence that (1) she was doing "substantially equal work on a job, the performance of which required substantially equal skill, effort, and responsibility as jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) [] she was paid at a lower wage than members of the opposite sex doing equal work." *Musgrove v. D.C.*, 775 F. Supp. 2d 158, 165 (D.D.C. 2011) (internal quotation marks omitted). In determining whether or not the plaintiff has put forth an appropriate comparator, the court considers whether or not there is "substantial equality" of work. *Goodrich v. Int'l Bhd. Of Elec. Workers, AFL-CIO*, 712 F.2d 1488, 1492 (D.C. Cir. 1983). "The question of whether employees are similarly situated ...

14

'ordinarily presents a question of fact for the jury.'" *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016) (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)). However, at the summary judgment stage, if the plaintiff fails to present "evidence that the comparators were actually similarly situated to [her]," summary judgment is appropriate. *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (internal quotation marks omitted omitted).

Here, Plaintiff alleges that all higher paid male professors in the Statistics Department of her same or lower position of rank and tenure are legally appropriate comparators. Pl.'s Opp'n, ECF No. 105-2, 21. This group of alleged comparators includes full professors Joseph Gastwirth, Hosam Mahmoud, Tapan Nayak, Zhaohai Li, Reza Modarres, Feifang Hu, and Hua Liang; associate professors Yinglei Lai and Jonathan Stroud; assistant professors Emre Barut and Winfried Barta; and Contract Professor Subrata Kundu. Specifically, Plaintiff contends that prior to the effective date of her promotion to full professor in September 2012, she may compare herself to all higher paid male associate, assistant, and contract professors in the Statistics Department; and, after the effective date of her promotion to full professor in September 2012, she may compare herself those same persons as well as each higher paid male full professor.

In its Motion and Reply, Defendant specifically disputes four of Plaintiff's 12 alleged comparators—Subrata Kundu and those who have served as chairs of the statistics department (Professors Zhaohai Li, Reza Modarres, and Tapan Nayak). The Court will address each of these individuals in turn.

First, Defendant argues that Dr. Subrata Kundu is not a comparator because he is a contract faculty member with different teaching, research, and service job requirements. Defendant contends that, as a non-tenure track contract professor, Dr. Kundu's renewable

contract emphasized teaching over research or service. Def.'s Stat., ECF No 101-2, ¶¶ 58-60. Dr.

Kundu's contract requires him to dedicate ███████████████████████████

███████████████████████████████████ *Id.* at ¶ 60. As such, Dr. Kundu

teaches six courses each academic year, as opposed to Plaintiff's four, and is expected to

complete less scholarship and research. *Id.* Based on these different job expectations, Defendant

contends that Dr. Kundu is not an appropriate comparator for Plaintiff.

In her deposition, Plaintiff conceded that she and Dr. Kundu do not perform substantially

equal work. Ex. 4, ECF No. 101-8, 496:1-497: 14 (Q: "Do you consider that you perform

substantially equal work as Dr. Kundu?" A: "No. He's a contract."). However, Plaintiff argues

that the fact that she and Dr. Kundu perform different work is irrelevant because Dr. Kundu's job

is performed under the same working conditions but requires less skill, effort, and responsibility.

Defendant counters that the D.C. Circuit does not accept defining comparators as those who

perform work that requires less skill, effort, and responsibility. However, the only case

Defendant cites in support, *Clay v. Howard University*, 128 F. Supp. 3d 22 (D.D.C. 2015), does

not address the issue. Def.'s Reply, ECF No. 108-1, 6-7.

The Court concludes there remain sufficient factual disputes as to whether or not Dr.

Kundu performs substantially equal work as Plaintiff to defeat summary judgment on this

ground. The Court interprets what constitutes equal skill, equal effort, and equal responsibility

with the EPA's broad remedial purposes in mind. 29 C.F.R. § 1620.14(a). Those remedial

purposes would not be served if the Court were to find that Dr. Kundu and Plaintiff are not

comparators because, even though Dr. Kundu is paid more, his job requires less skill, effort, and

responsibility. "[D]ifferences in skill, effort or responsibility which might be sufficient to justify

a finding that two jobs are not equal within the meaning of the EPA if the greater skill, effort, or

16

responsibility has been required of the higher paid sex, do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex." *Id.*

Here, Plaintiff has provided evidence that tenured professors and non-tenured professors share the same core responsibilities of teaching, research, and service. Ex. 8, ECF No. 105-13, 26: 1-28: 22; Ex. 9, ECF No. 105-14, 167: 1-168: 8; Ex. 6, ECF No. 105-11, 45: 3-6 (explaining that there is "very little" difference in the criteria for a tenure-track professor and a contract professor). Additionally, Plaintiff has provided evidence that a position as a tenured full professor is more highly regarded and requires more skill than a position as a contract professor. *See* Ex. 16, ECF No. 105-21 at 106: 3-20 (explaining that it is "unusual" for a non-tenure professor to be paid more than a tenured professor); Ex. 9, ECF No. 105-14, 166: 20-22 (same); Ex. 10, ECF No. 105-15, 187: 2-88: 1 (explaining that more is expected of tenured professors and that the position is "much more prestigious").

As such, the Court concludes that there is a factual dispute regarding whether or not Plaintiff's position as a full professor and Dr. Kundu's position as a contract professor are substantially equal. This factual dispute precludes summary judgment on this ground. In refusing to find that, as a matter of law, Dr. Kundu is not a comparator ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Def.'s Stat.,

ECF No. 101-2, ¶ 33.[6]

---

[6] ████████████████████████████████████████████████████████

████████████████████████████████████ Under Rule 407, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction. But the court may admit this evidence for another purpose." Fed. R. Evi. 407. Here, the disputed evidence is not being used for a prohibited

Second, Defendant contends that Drs. Zhaohai Li, Reza Modarres, and Tapan Nayak cannot be comparators because, based on their service as department chairs, they each performed different work than a full professor. While Plaintiff contends that Drs. Li and Nayak are comparators, she admits that their higher salaries are attributable to seniority and experience rather than to sex. Pl.'s Opp'n, ECF No. 105-2, 25 n.23. Because Plaintiff does not base her EPA claim on the disparate salaries of Drs. Li and Nayak, the Court need not determine whether or not these individuals are proper comparators. However, Plaintiff does base her EPA claim, in part, on Dr. Modarres's higher pay. Accordingly, the Court will determine whether or not Dr. Modarres can serve as a comparator despite his service as department chair from 2007 to 2013.

Defendant contends that Dr. Modarres did not perform substantially equal work as Plaintiff during his time as a department chair due to additional administrative responsibilities greater than the duties of a regular professor. As department chair, Dr. Modarres was responsible for providing "leadership and guidance for policies affecting the academic program and for the administrative work of the department." Ex. 1, ECF No. 101-5, ¶ 6 (internal quotation marks omitted). For example, the chair appoints a deputy chair, recruits new faculty, negotiates salaries, recommends merit pay increases to the dean, appoints faculty members to committees, reviews course offerings, and oversees the assignment of courses to faculty members. *Id.* at ¶ 7. The chair is also responsible for day-to-day operations including office staff, communications with students and parents, and other administrative duties. *Id.* In recognition of these additional duties,

███████████████████████████████████████████████████████████████████

██████████████████████████████████

---

purpose. Instead, ████████████████████████████████████████████████████████

████████████████████████████████████ As such, the Court may consider such evidence.

The Court begins by noting that teaching, research, and service establish a common core of job duties for Dr. Modarres and Plaintiff. However, the Court must next ask if additional tasks make the jobs sufficiently different. As chair of the department, Dr. Modarres's job entailed significant additional duties, making it substantially different as to the skill, effort and responsibility required. First, as to skill, the chair of the department is required to handle the administrative tasks that help the department function. As such, being the department chair requires different skills than being a professor. Second, as to effort, the department chair is tasked with recruiting, salary negotiations, reviewing courses, and overseeing assignments. These tasks can be time-consuming and potentially stressful, thus requiring more effort than the normal professorial role. *See* C.F.R. § 1620.16(a) (considering "[j]ob factors which cause mental fatigue and stress"). Finally, as to responsibility, the chair is responsible for providing "leadership and guidance for policies affecting the academic program" and for the administrative work of the department. Ex. 1, ECF No. 101-5, ¶ 6. Leading the department in both overarching policies and day-to-day minutiae is a significant responsibility that ordinary professors do not have.

Plaintiff alleges that, even if her role as a professor is not substantially equal to that of the department chair, her additional service work to the university makes her job substantially equal to Dr. Modarres's job. While Dr. Modarres may have served as department chair, Plaintiff contends that she performed substantially similar service to the university as the director of the statistics department's master's degree program from 2000-2006, as deputy chair of the statistics department from 2004-2007, and as director of the biostatistics PhD program from 2010- 2016. Ex. 14, ECF No. 105-19, Interrog. No. 2. But, Plaintiff provides no evidence as to what duties she performed while in these roles. As such, the Court cannot assess whether or not Plaintiff's

service roles required the same skill, effort, and responsibility as Dr. Modarres's service role as the department chair. For this reason, Plaintiff has not alleged a material factual dispute as to whether her job and Dr. Modarres's job were substantially equal. Accordingly, Plaintiff cannot compare herself to Dr. Modarres for purposes of her EPA claim.

In sum, the Court concludes that there remain material factual disputes as to whether or not Plaintiff has properly identified comparators, or higher paid males who performed substantially equal work as Plaintiff, for her EPA claim. However, the Court further concludes that Dr. Modarres is not a proper comparator as his additional duties as department chair resulted in a job requiring more skill, effort, and responsibility than Plaintiff's job. As the Court has addressed the comparators identified by Plaintiff and contested by Defendant, the Court will proceed to the second step in analyzing Plaintiff's EPA claim—Defendant's affirmative defenses.[7]

### 3. Defendant's Affirmative Defenses

Excluding Dr. Modarres, Plaintiff has identified 11 comparators for her EPA claim—full professors Joseph Gastwirth, Hosam Mahmoud, Tapan Nayak, Zhaohai Li, Feifang Hu, and Hua Liang; associate professors Yinglei Lai and Jonathan Stroud; assistant professors Emre Barut and Winifried Barta; and contract professor Subrata Kundu. Plaintiff concedes that the higher salaries of Drs. Gastwirth, Mahmoud, Nayak, and Li may be explained by their seniority and experience. Pl.'s Opp'n, ECF No. 105-2, 25 n.23. But, Plaintiff maintains that the higher salaries of the remaining 7 comparators (full professors Feifang Hu and Hua Liang; associate professors Yinglei

---

[7] Defendant also specifically challenged the comparator status of Drs. Li, Nayak, and Michael Larsen. But, Plaintiff concedes that the higher salaries of Drs. Li and Nayak are attributable to seniority and experience (rather than to sex); as such, the Court need not decide their comparator status. Pl.'s Opp'n, ECF No. 105-2, 25 n.23. Additionally, Plaintiff does not argue that Dr. Larsen is a comparator for purposes of the EPA, Title VII, or the DCHRA. *Id.* at 21 n.19.

Lai and Jonathan Stroud; assistant professors Emre Barut and Winifried Barta; and contract professor Subrata Kundu) are attributable to sex.

As Plaintiff has established a prima facie EPA claim, the burden now shifts to Defendant to prove that the unequal payments were made pursuant to "some legitimate, non sex-based factor." *Goodrich v. Int'l Brotherhood of Elec. Workers*, 815 F.2d 1519, 1523-24 (D.C. Cir. 1987). The EPA includes four statutory affirmative defenses to pay disparities between a plaintiff and comparators: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Defendant contends that it is entitled to summary judgment on Plaintiff's EPA claim because it made legitimate pay decisions based on the following affirmative defenses: (1) service as a department chair, (2) seniority, (3) Plaintiff's lack of collegiality, (4) market forces which affected hiring salaries, and (5) subjective decisions about annual merit pay increases. The Court will address each defense in turn.

### a. Service as a department chair

First, Defendant contends that service as a department chair is a factor other than sex which justifies any pay discrepancies between Dr. Bura and her colleagues who served as department chairs during the relevant time periods—Drs. Li, Modarres, and Nayak. As previously explained, Plaintiff does not allege that the pay discrepancies between herself and Drs. Li and Nayak are based on sex, so the Court need not address this argument as to them. Additionally, the Court has previously determined that Dr. Modarres is not a proper comparator. However, the Court will briefly explain why, even if Dr. Modarres was a proper comparator, Plaintiff has not created a material factual dispute concerning whether or not his higher pay from 2007 to 2013 is attributable to his service as department chair.

Department chairs receive a ███████████████, which is higher than the roughly ████████████████ for professors. Def.'s Stat., ECF No. 101-2, ¶ 65. Going forward, professors who have served as department chairs are more likely to have a higher salary because their salaries were increased by the comparatively larger annual merit pay increases during their time as chair.

Plaintiff does not contest the fact that department chairs receive higher annual merit pay increases than other professors and that these higher annual payments will result in a higher salary. Instead, Plaintiff argues that service as a department chair alone cannot fully explain the pay disparity between herself and Dr. Modarres.

Plaintiff contends that Dr. Modarres's higher salary arose ███ before he became the department chair. ████ Plaintiff and Dr. Modarres were both associate professors with comparable salaries. Ex. 27, ECF No. 105-32. But, in 2006, Dr. Modarres was awarded a large pay increase of ███ while Plaintiff was awarded a smaller pay increase. Ex. 25, ECF No. 105-30. As a result, beginning in ███, Dr. Modarres received a higher salary than Plaintiff, with the difference growing over time. Ex. 41, ECF No. 105-46. However, Plaintiff's argument, which focuses exclusively on Dr. Modarres salary before he became department chair, fails to create a material dispute of fact as to whether or not Dr. Modarres's service as chair accounts for his higher payments from 2007 to 2013.

Accordingly, it is undisputed that service as department chair explains Dr. Modarres higher payments from 2007 to 2013.

### b. Seniority

Second, Defendant contends that seniority is a legitimate factor other than sex which explains the pay disparity between Plaintiff and more senior professors. As an initial matter,

Plaintiff argues that Defendant does not have a bona fide seniority system which can be used as an affirmative defense under the EPA. In support, Plaintiff cites to an Eleventh Circuit case, *Irby v. Bittick*, 44 F.3d 949 (11th Cir. 1995), explaining that "[i]f a seniority 'system' based on longevity with the [employer] is to be relied upon as an affirmative defense, [the employer] must be able to identify standards for measuring seniority which are systematically applied and observed." 44 F.3d at 954. Under *Irby*, if a plaintiff can identify later-hired employees in the same position who are paid more, such persons "disprove[] the existence of such a seniority system." *Id.* at 955. Plaintiff argues that she has been employed by Defendant longer than ███, but they receive higher salaries, thus disproving a seniority system defense.

But, *Irby* is from outside this circuit and is not controlling on this Court. And, other circuits have not been as strict in their requirements for a seniority system. *See Fisher v. Vassar College*, 70 F.3d 1420, 1452 (2d 1995), *cert. denied*, 522 U.S. 1075 (1998) (denying the plaintiff's claim where her comparator was more senior because "[u]nder the clear terms of the Equal Pay Act, there is no liability and no discrimination if salary discrepancies can be explained through ... seniority"); *see also Markel v. Bd. Of Regents of Univ. of Wis. System*, 276 F.3d 906, 913 (7th Cir. 2002) (affirming denial of the plaintiff's EPA claim where her comparator had worked for the university longer than the plaintiff).

Regardless, the debate over whether or not the EPA requires a bona fide seniority system is somewhat esoteric. The EPA also provides for a catchall affirmative defense—"a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv). The amount of time a professor has been employed by Defendant is a "factor other than sex." And, Plaintiff has admitted that seniority is an appropriate consideration for compensation. *See* Ex. 2, ECF No. 101-6, 23: 15-20 ("I would like to be compensated similarly, equally as other male professors,

accounting for years..."); *Id.* at 22: 18-20 ("He was – he's a senior faculty member. I do not discount that, based on years and rank."). Accordingly, the Court finds it appropriate to consider seniority as an affirmative defense for Defendant.

There are five full professors senior to Plaintiff, and Plaintiff concedes that seniority accounts for the pay disparity for four of them. Pl.'s Opp'n, ECF No. 105-2, 25 n.23. Again, the only contested individual is Dr. Modarres, who the Court has already determined is not an appropriate comparator. Nevertheless, the Court will briefly address Plaintiff's argument.

Dr. Modarres was hired in 1991, five years before Plaintiff. When Plaintiff was promoted to full professor effective 2012, Dr. Modarres had been a full professor for five years. Def.'s Stat., ECF No. 101-2, ¶ 73. Defendant contends that Dr. Modarres's higher pay is justified not only by his position as department chair, but also by his seniority.

In opposition, Plaintiff makes the conclusory statement that seniority "cannot explain the pay disparity between her and Modarres during the time when they were both associate professors." Pl.'s Opp'n, ECF No. 105-2, 27. But, Plaintiff fails to explain why seniority cannot explain the pay disparity between herself and Dr. Modarres when they were both associate professors and Dr. Modarres had approximately five years more seniority than did Plaintiff. Def.'s Statement, ECF No. 101-2, ¶ 116. Plaintiff's conclusory statement is insufficient to create a material dispute of fact as to whether seniority is an affirmative defense to Dr. Modarres's higher salary.

### c. Lack of collegiality

Third, Defendant contends that Plaintiff's EPA claim fails because Defendant's pay decisions during the relevant time were influenced by Dr. Bura's lack of congeniality, a factor other than sex. Defendant provides multiple examples of Plaintiff's lack of a harmonious

relationship with others in the statistics department ███████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████ Based on these allegations and more, Defendant

contends that Plaintiff's lack of collegiality is a factor other than sex that affected pay decisions

concerning Plaintiff.

Plaintiff has two arguments as to why lack of collegiality cannot explain Defendant's pay

decisions. ████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

████ Plaintiff is correct that Defendant's evidence on lack of collegiality relates to incidents

from only after 2013. As such, lack of collegiality can be used to explain pay decisions only

during that time period.

Second, Plaintiff contends that, even for the time period after 2013, Defendant has failed

to present evidence that a lack of collegiality was actually a factor considered by the relevant

decision makers when making pay decisions. But, Defendant has submitted evidence that for the

2014-2015 academic year, ███████████████████████████

███████████████████████████████████████████

███████████████████████ Ex. 12, ECF No. 101-16, GW023687. And for

the 2015-2016 academic year, ███████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████ Ex. 13, ECF No. 101-17, GW023700. Accordingly, Defendant has

presented evidence that Plaintiff's lack of collegiality was noted █████████████████████

███████████████████████████████████████ Def.'s Stat., ECF

No. 101-2, ¶¶ 109-110.

Lack of collegiality is a permissible non-sex based factor which can be considered when

making pay decisions. *See Sutter v. Univ. Tex. at San Antonio*, No. SA-12-CV-969-OLG, 2013

WL 6919760, at *7 (W.D. Tex. Dec. 20, 2013) (finding denial of raise permissible where the

university determined that the professor "was inconsiderate and a disruptive influence on the

biology department"). And, Defendant has introduced contemporaneous evidence that Plaintiff's

lack of collegiality was noted b████████████████████████████████████

███ Accordingly, Defendant has established a collegiality defense with respect to merit pay

increases after 2013. However, Defendant has not argued or produced evidence that Plaintiff's

lack of collegiality *fully* accounts for discrepancies in pay decisions after 2013.

### d. Market forces and salary inversion

Fourth, Defendant argues that market forces account for pay discrepancies between

Plaintiff and professors who were hired after Plaintiff. Full professors Feifang Hu and Hua

Liang, both hired in 2013, and assistant professors Winfried Barta and Emre Barut, hired in 2012

and 2014 respectively, received starting salaries higher than Plaintiff's salary despite Plaintiff's

years of service. Defendant contends that the starting salaries of these new hires were set by

market forces and through negotiations between Defendant and each new hire.

Defendant argues that market forces are an important factor in determining the salaries of newly recruited faculty. Defendant further explains, through its expert Dr. Robert Speakman, that these market forces can result in "salary inversion," or in situations in which a junior professor, hired at a time when there is more competition, is paid more than a current professor with higher rank and years of service. Ex. 33, ECF No. 101-37, 5. Defendant contends that salary inversion is simply "a fact of life at GW and in academia generally." Ex. 1, ECF No. 101-5, ¶ 12. As a result of salary inversion, ██████████████████████████████████████████████████ ████████████████████████████████████ *See Stanley v. Univ. of S. Cal.*, 13 F. 3d 1313, 1322 (9th Cir. 1994) ("An employer may consider the marketplace value of the skills of a particular individual when determining his or her salary. Unequal wages that reflect market conditions of supply and demand are not prohibited by the EPA.").

As an initial matter Plaintiff contends that the Court should discount Defendant's evidence of salary inversion because other courts have shown "a healthy and appropriate skepticism of employers' claims that 'market forces' explain pay disparity between male and female employees who otherwise perform work of like skill, effort, and responsibility." Pl.'s Opp'n, ECF No. 105-2, 30; *see e.g., Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F. Supp. 985, 993 (D.N.J. 1996) ("[C]ourt[s] should not accept a 'market forces' defense unless the employer can rationally explain the use of market information."); *Ottaviani v. State Univ. of N.Y. at New Paltz*, 679 F. Supp. 288, 337-38 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 365 (2d Cir. 1989) (finding that "the market rate alone could not explain the wide disparity in the various starting salaries"). However, the cases cited by Plaintiff do not advise the wholesale discounting of evidence of market forces. Instead, they advise that the Court ensure that Defendant's reliance on market forces as an affirmative defense actually explains why such forces resulted in a newer

27

hire earning more than an established employee. Moreover, in her deposition, Plaintiff acknowledged that universities find market forces to be relevant in determining salary and that the market is "very competitive" for talent in the statistics field. Ex. 2, ECF No. 101-6, 58: 17-59: 22.

Plaintiff similarly argues that reliance on a theory of salary inversion, "specifically that professors with longer tenure are worth less in the market than newly hired professors, merely reinforces past discriminatory pay practices that have depressed wages for women with longtime faculty service like Plaintiff." Pl.'s Opp'n, ECF No. 105-2, 32. While it is unclear, the Court interprets Plaintiff's argument to be that the use of prior salary to set an employee's starting salary at a new job favors male employees who have historically been paid more. However, Plaintiff fails to adequately explain this argument, and she does not support it with any admissible evidence. Moreover, Defendant does not argue that prior salary, alone, supports differences in pay. Instead, Defendant argues that higher prior salaries are one factor, among many other market forces, that resulted in some later-hired professors receiving higher salaries than Plaintiff.

Next, Plaintiff attacks Defendant's expert on salary inversion, Dr. Robert Speakman. Plaintiff contests Dr. Speakman's testimony on the impact of salary inversion on pay decisions as well as his testimony on the impact of seniority on pay decisions. However, the Court has already addressed and rejected Plaintiff's complaints about Dr. Speakman. *See* Aug. 15, 2018 Order, ECF No. 98, 9-10.

In addition to her general attack on Dr. Speakman, Plaintiff cites some evidence to contradict his statements on the effect of market forces on salary decisions. Plaintiff's expert, Dr. Amanda Golbeck, noted that much of Dr. Speakman's analysis depended upon Defendant's

willingness to negotiate salaries. ████████████████████████████

████████████████████████████████████████████████ According to Dr.

Golbeck████████████████████████████████████████████████

████ "[i]t would seem that the market strength and competing offers factors are being applied

differentially to [Plaintiff]." Ex. 39, ECF No. 105-44, 11.[8]

Defendant contends that this equivocal statement, introduced by the phrase "it would

seem," is insufficient to create a genuine dispute of material fact as to Dr. Speakman's opinion

about the operation of market forces. The Court disagrees. Dr. Golbeck explained that when

████████████████████████████████████████████████

████████████████████████████████████ It is reasonable for Dr. Golbeck to

infer from this evidence that market strength and competing offers were not given the same

weight when setting a salary for Plaintiff as they were for ████████████. *See Thibodeaux-*

*Woody v. Houston Cmty. Coll.*, 593 F. App'x 280, 285 (5th Cir. 2014) ("If negotiation is not

available to persons of both sexes, it cannot be a legitimate nondiscriminatory reason for a pay

differential.").

In addition to a material dispute concerning Dr. Speakman's testimony on the use of

market forces, there remain material disputes concerning whether or not market forces can

actually account for the salary decisions for Drs. Hu, Liang, Barta, and Barut.

### 1. Dr. Feifang Hu

---

[8] Defendant argues that ████████████████████████████████████

████ should be excluded as a post-Complaint theory of liability. Def.'s Reply, ECF No. 108-1,

21-22. However, the Court need not consider the admissibility of the evidence in this context

because, in forming an opinion on a subject, experts may rely on information which would not be

admissible. *See* Fed. R. Evi. 703 ("If experts in the particular field would reasonably rely on

those kinds of facts or data in forming an opinion on the subject, they need not be admissible for

the opinion to be admitted.").

First, Dr. Hu was ███████████ as a full professor with a salary of ██████████, which was higher than Plaintiff's salary of ██████ as a full professor. Defendant contends that this pay difference was based on Defendant's ████████████████████████████████████████████ ████████████████████████████████████ In support of Dr. Hu's initial salary, Defendant cites to the facts that Dr. Hu had been a full professor since 2008 at University of Virginia; Dr. Hu had received nine research grants, supervised 13 doctoral students, and published two books and more than 70 articles; ██████████████████████████████████. Def.'s Stat., ECF No. 101-2, ¶¶ 86-89.

However, Defendant cites no evidence connecting Dr. Hu's qualifications to its salary decision. On the current record, it is not evident to the Court whether or not Dr. Hu's qualifications were sufficiently superior to Plaintiff's ████████████████████████████. "[A]bsent an explanation of how [market] factors actually resulted in [Dr. Hu] earning more than" Plaintiff, the Court cannot conclude that, as a matter of law, Dr. Hu's higher salary is attributable only to market forces, not to sex. *Brock v. Georgia S.W. Coll.*, 765 F.2d 1026, 1037 (11th Cir. 1985), *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 131 n.1 (1988). While there is some evidence that ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ Lacking such evidence, the Court cannot determine the extent to which Dr. Hu's ██████████ accounts for the pay differential, especially given that Defendant concedes that ████████ ████████████████████████████ Ex. 34, ECF No. 101-38, ¶ 19. Accordingly, there remains a material factual dispute as to whether or not Dr. Hu's higher salary can be fully explained by market forces and salary inversion.

## 2. Dr. Hua Liang

Second, Dr. Liang was ▮▮▮▮▮▮ as a full professor with a starting salary of ▮▮▮▮▮▮, which was higher than Plaintiff's salary of ▮▮▮▮ as a full professor. Def.'s Stat., ECF No. 101-2, ¶ 90. Defendant argues that this pay differential is fully accounted for by market forces. In support of its salary offer to Dr. Liang, Defendant cites evidence that Dr. Liang had been a full professor at the University of Rochester since 2009. *Id.* at ¶ 91. Additionally, Dr, Liang had two PhDs, had received 14 research grants, and had published two books and more than 110 research articles. *Id.* at ¶ 92. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at ¶ 94. Additionally, Defendant stated that Dr. Liang's ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ and that Dr. Liang was a ▮▮▮▮▮▮▮▮ resulting in Defendant agreeing to an initial salary of ▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 34, ECF No. 101-38, ¶ 21; Ex. 29, ECF No. 101-33, 164:10-165:10. When asked why Defendant decided on a starting salary of $150,000, Dr. Modarres, who had conducted the salary negotiations, stated ▮▮▮▮▮▮▮▮ ▮▮▮ Ex. 29, ECF No. 101-33, 165: 3.

Again, the Court finds that Defendant has not introduced sufficient evidence to establish that, as a matter of law, Dr. Liang's higher pay was based solely on market forces and not on sex. As evidence of market forces, Defendant contends that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But, Defendant cites no evidence as to what Dr. Liang's ▮▮▮▮▮▮ was. The only evidence of Dr. Liang's ▮▮▮▮▮▮ comes from Dr. Modarres, who testified, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Ex. 29, ECF No. 101-33, 165: 6-8. This equivocal statement is insufficient to establish that Dr. Liang's starting salary with Defendant was based on market forces. The Court also notes the difficulties in relying on ▮▮▮▮▮▮ to explain a wage differential. ▮▮▮▮▮▮▮▮



The Court further notes that there is a factual dispute concerning Dr. Liang's salary negotiations. Contemporaneous documents show that ███████████████████████ ████████████████████████████████████████ ████████████████████████ Ex. 44, ECF No. 105-49. Additionally, in contemporaneous emails, Dr. Modarres, who negotiated Dr. Liang's salary, requested that he be able to offer Dr. Liang a starting salary of ██████. *Id.* ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████ Accordingly, the Court concludes that there remains a material dispute as to whether or not market forces and salary inversion fully account for the pay disparity between Plaintiff and Dr. Liang.

### 3. Dr. Winfried Barta

Third, Dr. Barta was ██████████ as an assistant professor at a starting salary of ██████ which was higher than Plaintiff's salary of ██████ as an associate professor. Def.'s Stat., ECF No. 101-2, ¶ 95. This was Dr. Barta's first faculty appointment. *Id.* at ¶ 96. Defendant hired Dr. Barta because his academic record showed promise and he had been advised in his dissertation by a scholar with a strong reputation. █████████████████████████████ ██████████████████████████████████ *Id.* at ¶ 97. Dr. Modarres, who conducted Dr. Barta's salary negotiations, stated that Dr. Barta was a "very tough negotiator." According to Dr. Modarres, ████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ The parties then reached

an agreement. Ex. 34, ECF No. 101-38, ¶¶ 14-15.

Again, the Court finds that Defendant has not established, as a matter of law, that Dr.

Barta's starting salary is solely attributable to market forces. Defendant does not introduce any

evidence pertaining to the conditions of the market for assistant professors specializing in

statistics or explain why those conditions resulted in its decision for Dr. Barta's salary offer.

While Defendant introduces some evidence that Dr. Barta's salary was the result of negotiation,

that negotiation fails to establish that Dr. Barta's salary was set in accord with market forces.

Further questioning Defendant's "market forces" explanation, Plaintiff introduced evidence that

in 2012-2013 the average assistant professor at a private doctoral university, like Defendant,

earned $90,622, not accounting for years of service. Ex. 47, ECF No. 105-52. Based on this data,

the average assistant professor salary at a university like Defendant was ████████████████

██████████████████████████████████████. The Court further notes that

the same salary chart shows that the average associate professor at a private doctoral university

earned $104,016, ████████████████████████████████. *Id.* Defendant's

argument that "market forces" required it to pay Dr. Barta ██████ is weakened by the fact that

Defendant was not concerned that Plaintiff's salary ████████████████████████

████████████████████████ Accordingly, the Court concludes that there remain material

disputes of fact as to whether or not Dr. Barta's higher salary is fully attributable to market forces

and salary inversion.

### 4. Dr. Emre Barut

Fourth, ████ Defendant hired Dr. Barut as an assistant professor with a starting salary of ████ which was higher than Plaintiff's salary of ████ as a full professor. Def.'s Stat., ECF No. 101-2, ¶ 98. This position was Dr. Barut's first faculty appointment. Defendant contends that it hired Dr. Barut because of his academic record and the fact that he had been advised by a prominent scholar in the field. *Id.* at ¶ 101. Dr. Modarres, who negotiated Dr. Barut's salary, reported that █████████████████████████████████ ████████████████████████████████ Dr. Modarres explained that it was a ████████████████████████████ but eventually the parties agreed on an initial salary of ████. Ex. 34, ECF No. 101-38, ¶¶ 16-17.

Defendant's evidence of "market forces" as to Dr. Barut suffers from the same shortcomings as Defendant's evidence of "market forces" as to Dr. Barta. Again, Defendant introduces no evidence pertaining to the conditions of the market for assistant professors specializing in statistics nor does Defendant explain why those conditions resulted in the decision to set Dr. Barut's starting salary at ████. While Defendant introduces some evidence that Dr. Barut's salary was the result ████████, such evidence does not establish that Dr. Barut's salary was set in accord with market forces. Again, the Court considers Plaintiff's evidence that in 2013-2014 the average assistant professor at a private doctoral university, like Defendant, earned $93,844, not accounting for their years of service. Ex. 48, ECF No. 105-53. This average salary is almost ████████████████████████████ ████████████████ The Court further notes that the same salary chart shows that the average full professor at a private doctoral university earned approximately $173,890, ██████████ ████████████ *Id.* Defendant's argument that "market forces" required that Dr. Barut's starting salary be set at ████ is weakened by the fact that Defendant was not concerned that ████████

███████████████████████████████████. Accordingly, the Court concludes

that there remain material disputes of fact as to whether or not market forces and salary inversion

fully account for Dr. Barut's higher salary.

### 5.  Summary

In summary, the Court finds that there is a material dispute as to whether or not salary

inversion and market forces can account for the salary disparities between Plaintiffs and the

later-hired male professors Drs. Hu, Liang, Barta, and Barut.[9]  Accordingly, Defendant has failed

to establish as a matter of law that these salary disparities are explained by salary inversion and

market forces rather than by sex.

### e.  Annual merit pay increases

Lastly, Defendant argues that higher annual merit pay increases can account for pay

disparities between Plaintiff and other male professors. The annual merit pay increases in dispute

occurred in 2007, 2008, 2012, and 2013. Defendant contends that these annual merit pay

increases were based on legitimate merit considerations; Plaintiff contends that she received

lower annual merit pay increases on account of her sex. The Court finds that there remain

material factual disputes concerning whether or not these annual merit pay increases can be used

to show that Plaintiff's pay disparity was based on a factor other than sex.

Prior to analyzing the parties' proffered evidence, the Court must resolve two initial

issues. First, Defendant contends that annual merit pay increases from 2007 and 2008 cannot be

---

[9] Defendant contends that it hired ████████████, a female, ██████ as an associate professor at a starting salary of ███████, which was higher than Plaintiff's salary of ██████ as a full professor. Def.'s Stat., ECF No. 101-2, ¶ 103. Defendants argue that the fact that a female new-hire also benefitted from salary inversion and market forces is evidence that the salary disparities are not explained by sex. But, the relevant comparison under the EPA is what Defendant paid Plaintiff as compared to employees of the opposite sex. As such, evidence on ██████████ initial salary does not alter the Court's analysis.

considered as they occurred outside the limitations period. The Court has already addressed this
argument. *See Supra* Sec. III.B.1. Defendant is correct that its decisions on merit pay increases in
2007 and 2008 occurred outside the limitations period. However, "[e]vidence of wage
discrimination need not be confined to the EPA's ... limitation period, ... for a court may
consider relevant evidence from before that period while assessing the worker's claims." *Price*,
664 F.3d at 1191. Defendant cannot shield itself from an EPA claim by arguing that "the unequal
payments began prior to the statutory period." 29 C.F.R. § 1620.13(b)(5). Instead, a claim for
disparate pay is treated as a continuing violation with "each paycheck resulting from the original
'discriminatory compensation decision or other practice' trigger[ing] a new filing period, in
effect reviving a claim that otherwise would have been time-barred." *Johnson*, 632 F. Supp. 2d at
22 (discussing disparate pay claims under Title VII). Accordingly, Plaintiff may use Defendant's
annual merit pay increase decisions from 2007 and 2008 as evidence that her paychecks within
the statutory period were lower based on her sex.

Second, Plaintiff contends that Defendant cannot rely on a "merit system" to justify
differences in salaries because Defendant does not have an "objectively measured set of rules
that are consistently applied and not subject to excessive subjective judgment." Pl.'s Opp'n, ECF
No. 105-2, 38 n.35. Plaintiff cites two cases in support of her argument, but neither are binding
or persuasive. First, in *Ottaviani v. State University of New York at New Paltz*, 679 F. Supp. 288
(S.D.N.Y. 1988), the court found that a merit system could not explain salary discrepancies
because there was no systematic evaluation of employees; instead, employees had to nominate
themselves for merit increases. 679 F. Supp. at 337-38. Conversely, here, professors are reviewed
annually for merit pay increases based on set criteria—teaching, research, and service to the
university. Second, in *Brock v. Georgia Southwestern College*, 765 F.2d 1026 (11th Cir. 1985),

the defendant had conceded at oral argument that its merit system did not qualify as an affirmative defense under the EPA based on the Eleventh Circuit's precedent. 765 F.2d at 1036. Here, there has been no such concession and this Court is not bound by the Eleventh Circuit's narrow interpretation of "merit system."

Moreover, even if Defendant's annual merit pay increases do not constitute a formal "merit system," such pay increases are still pay decisions based on "any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv). And, because annual merit pay increases are decided based on a professor's merit in teaching, research, and service to the university, these pay decision "are not overly subjective so as to render them incapable of being rebutted [and] they are legitimate factors to be considered." *Schwartz v. Fl. Bd. of Regents*, 954 F.2d 620, 623-24 (11th Cir. 1991); *see also Brousard-Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 979 (8th Cir. 1991) (determining that scholarly work and teaching performance are legitimate factors for pay discrepancies). Accordingly, the Court concludes that Defendant's annual merit pay increases are a legitimate factor to consider under the EPA.

Moving to the substance of the parties' arguments, Defendant contends that Dr. Bura's annual merit pay increases in 2007, 2008, 2012 and 2013 were lower than other higher paid male professors based on legitimate judgments about her performance relative to those other male professors. The Court will briefly review Plaintiff's 2007, 2008, 2012, and 2013 annual merit pay increases as compared to two higher paid males, Dr. Subrata Kundu and Dr. Yinglei Lai.[10]

---

[10] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Def.'s Stat., ECF
No. 101-2, ¶ 33. They are also the two professors that Defendant used in its briefing as comparators for Plaintiff's 2007, 2008, 2012, and 2013 annual merit pay increases. *See* Def.'s Mot., ECF No. 101-2, 28-35.

In 2007, Plaintiff ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████. She received a ████ percent merit pay

increase. Def.'s Stat., ECF No. 101-2, ¶ 117. Dr. Kundu, a contract assistant professor, ██████

███████████████████████████████████████████████████████

████████████████████████████████████████ He received a █████

percent merit pay increase. *Id.* at ¶ 118. Dr. Lai, an assistant professor, ██████████████████

███████████████████████████████████████████████████████

██████████████████████ Dr. Lai received a █████ percent merit pay increase. *Id.* at 119.

In 2008, Plaintiff █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

She received a █████ percent merit pay increase. *Id.* at ¶ 120. Dr. Kundu ██████████████

███████████████████████████████████████████████████████

██████████████████████ Dr. Kundu received a █████ percent merit pay increase. *Id.*

at ¶ 121. And, Dr. Lai ████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ Dr. Lai received a █████ percent merit pay increase. *Id.* at ¶

122.

Again, in 2012, ██████████████████████████████████████

███████████████████████████████████████████████████████

██████████████ She received a █████ percent merit pay increase. *Id.* at ¶ 123. Dr. Kundu ████████

███████████████████████████████████████████████████████

██████████████████████████████████████ Dr. Kundu received a ██

percent merit pay increase. *Id.* at ¶ 124. And, Dr. Lai, who was on sabbatical, ██████

████████████████████████████████████ Dr. Lai received a ██

percent merit pay increase. *Id.* at ¶ 125.

Finally, in 2013, █████████████████████████████████████

████████████████████████████████████████████████

████████████████ She received a ████ percent merit pay increase. *Id.* at ¶ 126. Dr. Kundu ████

██████████████████████████████████████████████████

█████████████████████████████ Dr. Kundu received a ██

percent merit pay increase. *Id.* at ¶ 127. Dr. Lai ██████████████████████

████████████████████████████████████████████

████ Dr. Lai received a ████ percent merit pay increase. *Id.* at ¶ 128.

Based on this information, the Court finds that there is a material factual dispute as to

whether or not Plaintiff's lower annual merit pay increases in 2007, 2008, 2012, and 2013 were

attributable to legitimate judgments about relative performance. Defendant's judgments about the

relative value of each professor's contributions were based on subjective assessments, not on

objective or quantitative evidence. For example, ████████████████████████████████

██████████████████████████████████████████████ Defendant

has introduced no evidence that there is a specific dollar amount, or percentage amount, attached

to each professional activity. *See Klein v. New York Univ.*, 786 F. Supp. 2d 830, 851 (S.D.N.Y.

2011) (denying summary judgment on the plaintiff's EPA claim where professors' pays were

decided, in part, based on subjective assessments).

Instead, it appears that decisions on merit pay increases were driven almost exclusively by the department chair's opaque decision-making process as to the value of each professor's teaching, research, and service. Plaintiff has produced evidence that Defendant provides no policy, training, or instruction with respect to awarding merit pay increases. ███████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

Rather than following a set formula, the department chair subjectively decided a professor's merit pay increase based on that professor's Annual Report. The suggested increase was then sent to the dean; however, there was no requirement that the department chair explain a rationale for the proposed pay increases. ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████ Finally, the merit pay increase recommendation is sent to the provost for final approval. Given the murky nature of the merit pay increase decision-making process, the Court cannot foreclose the possibility that the disparity in pay was on account of sex. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 827-28 (6th Cir. 2000) (finding that the district court erred in ordering judgment as

a matter of law for defendant on the plaintiff's EPA claim, in part, because "the merit award

system was driven largely by an opaque, decision-making process at the administrative level").

Lacking objective guidelines for how the contributions of professors should be weighed,

the Court is unable to find, as a matter of law, that Plaintiff's contributions were less valuable

than those of other higher-paid male professors. Additionally, Plaintiff has introduced evidence

that the merit pay increases did not accurately reflect the professors' relative value.

As evidence that Defendant's pay decisions did not accurately reflect each professors'

relative value, Plaintiff cites her ███████ analysis ██████████████

████████████████████████████

███████████████ Def.'s Stat., ECF No. 101-2, ¶ 34.

██████████████████████████

██████████████

Pursuant to Federal Rule of Evidence 407, "[w]hen measures are taken that would have

made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not

admissible to prove … culpable conduct … [b]ut the court may admit this evidence for another

purpose." Fed. R. Evi. 407. Here, the Court finds that the ███████ analysis conducted

by Defendant was not a "measure" that would have made an "earlier injury or harm less likely to

occur." Instead, the ███████ analysis is more akin to a post-event investigative report

which simply organized and analyzed information which was already in Defendant's control, the

purpose of which was to determine if remedial measures were necessary. ███████

██████████████████████████

███████████████ Rule 407 "only prohibits

evidence … of subsequent remedial measures, not evidence of a party's analysis" of its own

processes and procedures which may have led to the harm in question. *Brazos River Auth. v. GE*

*Ionics, Inc.*, 469 F.3d 416, 430 (5th Cir. 2006) (internal quotation marks and citations omitted).

As such, the Court concludes that the excludable remedial measure was not the █████████

██ analysis ████████████████████████████████████ *See, e.g., McFarlane*

*v. Caterpillar, Inc.*, 974 F.2d 176, 181-82 (D.C. Cir. 1992) (explaining in dicta that portions of a

post-accident service report indicating that equipment did not meet manufacturing specifications

should not have been excluded under Rule 407 because the report explained conditions as they

were at the time and was not evidence of subsequent remedial measures); *Rocky Mountain*

*Helicopters, Inc. v. Bell Helicopters Textron, a Div. of Textron, Inc.*, 805 F.2d 907, 918 (10th Cir.

1986) (explaining that a post-accident report was not excludable under Rule 407, but the

subsequent re-design was excludable); *Prentiss & Carlisle Co. v. Koehring-Waterous Div. of*

*Timberjack, Inc.*, 972 F.2d 6, 10 (1st Cir.1992) (explaining that a post-accident test and report of

an allegedly defective product is not a subsequent remedial measure even if the report may result

in remedial measures being taken); *Brazos*, 469 F.3d at 430 (explaining that post-event reports

are not excludable under Rule 407 because "by themselves, post-accident investigations would

not make the event 'less likely to occur;' only the actual implemented changes make it so");

*Wilson v. Beebe*, 770 F.2d 578, 590 (6th Cir .1985) (not excluding a post-event report under Rule

407 because the report "did not recommend a change in procedures following the shooting; it

was a report of that incident and nothing more"). Accordingly, the Court concludes that evidence

of the ██████████ analysis is admissible, ███████████████████████

████████████████████████████████

    Considering Plaintiff's ██████████ analysis, the Court finds that Plaintiff has

introduced evidence sufficient to create a material dispute as to whether or not Defendant's

annual merit pay increases were based on a factor other than sex. *See* Ex. 31, ECF No. 105-36

(Plaintiff's ███████████ analysis). In discussing the merit pay increases for 2011, ████



Ex. 33, ECF No. 105-38. And in discussing the

████████████ analysis, ████████████████████████

███████████████████████████████████████████

██████ Ex. 16, ECF No. 105-21, 150: 18-22. ████████████████

███████████████████████████████████████████

████████████████████ *Id.* at 151: 1-7.  As such, Plaintiff has

produced evidence which creates a factual dispute as to whether or not Defendant's merit pay

decisions were actually based on the relative merit of the professors.

    In addition to challenging the 2007, 2008, 2012, and 2013 merit pay increases, Plaintiff

also challenges Defendant's 2006 and 2008 pay increases made to bring the salaries of certain

professors above the 80th percentile of median salaries for professors as determined by the

American Association of University Professors ("AAUP"). Specifically, Plaintiff contends that in

2006, ████████ was awarded an ████ percent AAUP increase; ████ was awarded a ████

percent AAUP increase, and ████████ was awarded a ████ percent AAUP increase. *See* Ex. 25,

ECF No. 105-30; Ex. 23, ECF No. 105-28; Ex. 24, ECF No. 105-29 (respectively). That same

year, Plaintiff was awarded only a ████ percent increase. Ex. 26, ECF No. 105-31. And in 2008,

Plaintiff alleges that ████████ was again awarded an AAUP increase while Plaintiff was not. Ex.

29, ECF No. 105-34.

    Defendant has two arguments as to why the 2006 and 2008 pay increases cannot be

considered. First, Defendant contends that these pay increases occurred outside the statute of

limitations. The Court has already addressed this issue. *See Supra* Sec. III.B.1. Again, the Court concludes that, even though these payments occurred outside the status of limitations, "[e]vidence of wage discrimination need not be confined to the EPA's ... limitation period, ... for a court may consider relevant evidence from before that period while assessing the worker's claims." *Price*, 664 F.3d at 1191.

Second, Defendant contends that the Court cannot consider the 2006 and 2008 AAUP pay increases because Plaintiff did not disclose this theory of liability during discovery despite Defendant's specific requests that she identify all factual bases for her claim. Defendant points to its interrogatory asking Plaintiff to "[s]tate the full factual basis for [her] allegation in paragraph 89 of the Complaint that GW has engaged in a 'practice of paying [Plaintiff] less than comparable men in the Statistics Department.'" Ex. 3, ECF No. 101-7, 15. In her response, Plaintiff stated that she "is the lowest paid full professor, and was paid lower than male associate professors." *Id.* Plaintiff specifically stated that she was improperly paid less than ███████, and she referenced a salary increase received by ███████ in 2006. *Id.* Additionally, in answering a similar interrogatory about the factual basis for her allegation that her credentials far exceed male professors who are compensated at a higher rate, Plaintiff specifically cited ███████ as an example of such an occurrence. *Id.* at 14. On the present record, the Court finds that Plaintiff's responses to the interrogatories were sufficient to put Defendant on notice that her EPA "theory of liability" was based on the higher salaries of ███████ Defendant's interrogatory was not so specific as to require Plaintiff to allege each of Defendant's pay decisions which ultimately led to ███████

Defendant cites only one case in support of the fact that it was prejudiced by Plaintiff's alleged discovery violation, *Williams v. Devlin*, 142 F. Supp. 3d 76 (D.D.C. 2015). But in that

case, it was undisputed that the relevant evidence had not been disclosed during discovery. *Williams*, 142 F. Supp. 3d at 77-78. Here, Plaintiff's discovery violation was alleged only in Defendant's Reply, and Plaintiff has not had the opportunity to respond to, much less to concede, the issue. Moreover, Defendant's argument relating to the discovery violation numbers only three sentences. As such, the Court is not prepared to find a discovery violation at this time and exclude Plaintiff's evidence. If as the record develops and both parties provide additional argument, it becomes appropriate, the Court will reconsider this issue. But, for now, the Court will consider Plaintiff's allegations relating to the AAUP pay increases in 2006 and 2008.

Moving to the substance of parties' arguments concerning the AAUP pay increases, Plaintiff argues that in 2006 ███████████████ received disproportionately high pay increases and that in 2008 █████ received a disproportionately high pay increase. The Court begins by noting ████████████████████████████████ *See Supra* Sec. III.B.2.[11] As to █████████, Defendant contends that its decision to increase their salaries above the AAUP 80th percentile is a factor other than sex which justifies the salary increases. However, Defendant fails to explain why two male professors' salaries needed to be increased above the AAUP 80th percentile, while Plaintiff's salary did not need to be increased.

Additionally, Plaintiff has produced sufficient evidence to create a material dispute as to whether or not relative performance can account for the AAUP salary increases in 2006 and 2008. Prior to the 2006 pay increase, ██████████████████████████ ████████████████████████████████

---

[11] Moreover, it appears that █████████ did not receive an AAUP increase █████. The letter acknowledging ██████████ pay increase states that additional AAUP pay increases are "for assistant and full professors." Ex. 25, ECF No. 105-30. ██████████████ ███████ Ex. 31, ECF No. 101-35.



Ex. 51, ECF No. 105-56. In comparison, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 50, ECF No. 105-55. And, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 49, ECF No. 105-54. Based on the record evidence, the Court cannot say as a matter of law that ▮▮▮▮▮▮▮▮▮ relative performances merited a higher percentage increase than Plaintiff's. The same is true for the 2008 pay increases for reasons that were previously discussed.

Accordingly, Defendant has failed to establish as a matter of law that the salary disparities between Plaintiff and other male professors are sufficiently explained by annual merit pay increases in 2007, 2008, 2012, and 2013 or by AAUP increases in 2006 and 2008. There remain material disputes of fact which preclude summary judgment on this ground.

### 4. Conclusion on Plaintiff's EPA Claim

In summary, the Court DENIES Defendant's motion for summary judgment on Plaintiff's EPA claim. The Court concludes that Defendant has shown as a matter of law that Dr. Modarres is not a comparator. However, there remain material disputes as to whether or not Defendant's affirmative defenses fully account for the pay discrepancies between Plaintiff and the remaining male professor comparators. Defendant's first two defenses, service as chair and seniority, are disputed only as to Dr. Modarres, who is not a comparator. Defendant's third defense, lack of collegiality, applies to pay decisions made after 2013; but, Defendant has not produced evidence that lack of collegiality fully accounts for discrepancies in pay decisions during that timeframe. And, there remain material disputes of fact as to Defendant's final two affirmative defenses,

market forces/salary inversion and annual merit pay increases. Accordingly, Plaintiff may proceed with her EPA claim.

## C. Plaintiff's Title VII and DCHRA Claims

Defendant further requests summary judgment on Plaintiff's Title VII and DCHRA sex discrimination claims. Pursuant to Title VII of the Civil Rights Act, it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII claims are assessed pursuant to the burden-shifting framework originally set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). First, to allege a prima facie case, a plaintiff must show that she "is a member of a protected class," that she "suffered an adverse employment action," and that "the unfavorable action gives rise to an inference of discrimination." *Youssef v. F.B.I.*, 687 F.3d 397, 401 (D.C. Cir. 2012) (internal quotation marks omitted). Once the plaintiff has made a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [employment action that is challenged].'" *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *McDonnell Douglas*, 411 U.S. at 802). After the employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court is left to determine whether the plaintiff has put forth enough evidence to defeat the defendant's proffer and support a finding of discrimination. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008). On a motion for summary judgment, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find the employer's asserted non-discriminatory reason was not the actual

reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494. Courts apply this same analysis for claims brought under the DCHRA. *Cain v. Reinoso*, 43 A.3d 302, 306-07 (D.C. 2012).

As an initial matter, the Court notes that while the EPA and Title VII (and by extension the DCHRA) each provide remedies for disparate pay based on sex, "the EPA and Title VII are not the same." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640 (2007), *overturned by legislation on other grounds*. For example, the EPA is narrower than Title VII because "the [EPA] is restricted to cases involving 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions,'" while Title VII is not. *County of Washington v. Gunther*, 452 U.S. 161, 168 (1981). However, the EPA is also broader than Title VII in other ways. For example, the EPA has a longer statute of limitations, does not require exhaustion, and does not require proof of intentional discrimination. *Ledbetter*, 550 U.S. at 640; *See* 29 U.S.C. § 206(d)(1) (asking only whether the alleged inequality resulted from "any other factor other than sex"). Accordingly, the fact that the Court has denied summary judgment on Plaintiff's EPA claim does not necessitate the Court's denial of summary judgment on Plaintiff's Title VII and DCHRA claims.

Turning to Plaintiff's claims under Title VII and the DCHRA, Defendant has put forth five nondiscriminatory reasons for Plaintiff's alleged disparate pay—service as department chair, seniority, Plaintiff's non-collegiality, market forces/salary inversion, and annual merit pay increases. As Defendant has raised nondiscriminatory defenses, the Court is no longer concerned with whether or not Plaintiff put forth a prima facie case of discrimination. *See Brady*, 520 F.3d at 493-94. Instead, the Court is concerned only with whether or not Plaintiff has "produced

sufficient evidence for a reasonable jury to find that [Defendant's] asserted non-discriminatory reason[s were] not the actual reason and that [Defendant] intentionally discriminated against [Plaintiff] on the basis of ... sex." *Brady*, 520 F.3d at 494.

To begin, the Court notes that Defendant argues that the discriminatory comments to which Plaintiff cites in her brief as evidence of a discriminatory environment cannot be used to infer discrimination as they are outside the "scope of discovery." Defendant points to the Court's May 16, 2016 Order concerning a teleconference during which "the Court issued a finding that the applicable time period for the discovery requests in question is from 2004 to the present." May 16, 2016 Order, ECF No. 24. However, the Court's order concerned only the "discovery requests in question" which involved the type and amount of compensation paid to professors in the statistics department. As such, the Court's May 16, 2016 Order does not apply to the discriminatory comments relied upon by Plaintiff which do not concern compensation. Moreover, only one comment predates 2004—Dr. Mahmoud's 2000 comment concerning the number of "worthy" women in science. Ex. 10, ECF No. 105-15, 232: 6-10. Accordingly, the Court concludes that the comments are not outside the scope of discovery.

Moving to the substance of the parties' arguments, the Court finds that Plaintiff has produced sufficient evidence of disparate pay based on sex to survive summary judgment on her Title VII and DCHRA claims. As was fully explained above, Plaintiff has introduced evidence sufficient to create a material dispute of fact as to whether or not Defendant's proffered non-discriminatory reasons were the actual reasons for Defendant's pay decisions. *See Supra* Sec. III.B.3; *see e.g. Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) (reversing district court's grant of summary judgment on the plaintiff's Title VII claim, in part, because the plaintiff introduced evidence "challeng[ing] the objective validity of [the Defendant's] ... explanation");

*Said v. Nat'l RR Passenger Corp.*, 317 F. Supp. 3d 304, 326-27 (D.D.C. 2018) (denying

summary judgment on the plaintiff's 42 U.S.C. § 1981 claim because "the plaintiff has identified

sufficient evidence to cast doubt on some of the defendant's proffered reasons"); *Brady*, 520 F.3d

at 496 n.4 (explaining that in the context of Title VII "discrediting an employer's asserted reason

is often quite probative of discrimination"); *Hamilton v. Geithner*, 666 F.3d 1344, 1351-52 (D.C.

Cir. 2012) (reversing the district court's grant of summary judgment on the plaintiff's Title VII

discrimination claim and explaining that "we do not routinely require plaintiffs to submit

evidence over and above rebutting the employer's stated explanation in order to avoid summary

judgment" (internal quotation marks omitted)).  Moreover, in addition to introducing evidence

sufficient to create a material dispute of fact as to the legitimacy of Defendant's

nondiscriminatory explanations, Plaintiff has also introduced some evidence that would allow a

reasonable jury to infer sex discrimination. *See, e.g., Morris*, 825 F.3d at 670 (discussing stray

discriminatory remarks made remotely in time and stating that "we have found these types of

statements to support a verdict for a Title VII plaintiff"); *Reeves v. Sanderson Plumbing

Products, Inc.*, 530 U.S. 133,152-53 (2000) (cautioning lower courts against discounting

discriminatory statements "not made in the direct context of [the challenged employment

action]"); *Kelly v. Airborne Freight Corp*, 140 F.3d 335, 347 (1st Cir. 1998) (explaining that

"statements by nondecisionmakers can be evidence that a discriminatory atmosphere pervades

the workplace and infects the company's personnel decisions").

Accordingly, the Court DENIES Defendant's Motion for Summary judgment on

Plaintiff's Title VII and DCHRA claims. The Court concludes that Plaintiff has produced

sufficient evidence to create a material dispute over the legitimacy of Defendant's proffered

nondiscriminatory reasons for its pay decisions. Additionally, Plaintiff has adduced some

evidence that would allow a reasonable jury to infer discrimination. While the Court concludes

that summary judgment is not appropriate in these circumstances, the Court makes no judgment

as to whether or not Plaintiff will ultimately be able to establish discriminatory intent.

## IV. CONCLUSION

In sum, the Court DENIES Defendant's motion for summary judgment as to Plaintiff's

EPA, Title VII, and DCHRA claims.  For Plaintiff's EPA claim, the Court concludes that,

excluding Professor Reza Modarres, there remain material disputes as to whether or not Plaintiff

has properly identified higher-paid male comparators. Additionally, Plaintiff has introduced

evidence of material disputes as to Defendant's affirmative defenses for the pay discrepancies.

For Plaintiff's Title VII and DCHRA claims, Plaintiff has produced evidence to create a material

dispute as to whether Defendant's proffered nondiscriminatory explanations are the actual reason

for the pay discrepancies or whether Defendant intentionally discriminated against Plaintiff. An

appropriate Order accompanies this Memorandum Opinion.

___/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
